UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA
FRESNO DIVISION

In re                          ) Case No. 16-11072-B-13
                               )
Ellyn D. Lopez,                ) DC No. MHM-1
                               )
                Debtors.       )
                               )

**MEMORANDUM DECISION REGARDING OBJECTION
TO CONFIRMATION OF CHAPTER 13 PLAN**

Deanna Hazelton, Esq., appeared on behalf of the chapter 13 trustee, Michael H. Meyer, Esq. Patrick Kavanagh, Esq., appeared on behalf of the debtor, Ellyn D. Lopez (the "Debtor" or "Lopez").

**Introduction**[1]

The "cobra effect" is the unintended consequence of a blanket rule. The serpent slithers and coils around the allowable expenses debtors may use to determine their "projected disposable income" under 11 U.S.C §§ 1325(b)(2) and 707(b)(2)(A) and (B). When the broad sweep of a rule results in too much "human ingenuity," the cobra effect arises and the serpent strikes. The bankruptcy court then tames the snake, applies the law, and determines whether the debtor or creditor loses. This

---

[1] This memorandum decision contains the court's findings of fact and conclusions of law required by Federal Rule of Civil Procedure 52(a), made applicable to this contested matter by Federal Rules of Bankruptcy Procedure 7052 and 9014(c). The court has jurisdiction over this matter under 28 U.S.C. § 1334, 28 U.S.C. §'s 157 (a) and (b) and General Order Nos. 182 and 330 of the U.S. District Court for the Eastern District of California.

case shows the importance of the bankruptcy court keeping the keys to the cobra's den.

**Background and Findings of Fact.**

According to the record in the main docket and the related dischargeability complaint filed by a major unsecured creditor (AP# 16-01073),[2] the Debtor was propelled into this case by a series of internet financial transactions in 2015.[3] The Debtor filed her chapter 13 bankruptcy case on March 30, 2016, with all schedules and a chapter 13 plan. The Debtor has worked as an LVN approximately 11 years for one employer, and now has a second job. From both jobs her gross income totals $6,561 per month, $5,046 after taxes, and her total expenses are $3,631. Her net income is $1,415, which is the amount she proposes as a monthly plan payment.

The Debtor's schedules show that her two young adult sons live with her as dependents, that she owns a home, three vehicles, and few other assets. She pays $775 per month on a loan secured by a first deed of trust encumbering her home with a balance of $53,687. Her home has a fair market value of approximately $190,000. She pays $462 per month on a loan

---

[2] That adversary proceeding was settled by a stipulated judgment entered August 3, 2017.

[3] There does not appear to be any dispute regarding the facts underlying this case as recited in the complaint in the AP: The Debtor was a victim of fraud when, in April 2015, she joined a dating website and began to communicate with "Tyler Nunez." Subsequently she made arrangements to marry "Nunez." He instructed her to empty her IRA and wire him the money, resulting in her priority tax debt. When he told her he needed more money, assuring her he would repay the loan, she incurred much of the secured and unsecured debt listed in her case.

secured by a second deed of trust which secures $86,179.[4]  The
Automobile, a 2005 Toyota Highlander, is valued at $10,486. and
is encumbered by the Automobile Loan in the amount of $13,586.[5]
The Debtor contends the Automobile is worth less.[6]  The Debtor's
average monthly payment on the Automobile Loan over the 60 month
term of the plan is $256.38.[7]  The other automobiles are
unencumbered and are valued at less than $8,400.  Her total
personal and household items are valued at $1,400. and her total
financial assets, including an annuity, are valued at $28,029.

---

[4] The Debtor's junior deed of trust was obtained as one in the series of
loans she obtained related to the internet transactions with "Nunez."

[5] The Debtor obtained her re-finance loan on the Automobile from
Springleaf Financial Services.  Although non-purchase money loans secured by
cars are sometimes known as "Car Title Loans," the Automobile Loan falls in a
different category.  A "Title Loan" is defined as, "A short-term loan in which
the borrower's car title is used as collateral. The borrower must . . . (own
the car outright). Loans are usually for less than 30 days. If the loan is
not repaid, the lender can take ownership of the car and sell it to recoup
the loan amount.  These loans are also known as "auto title loans" or just
'title loans'.  Car title loan lenders often target those with low incomes and
bad credit and charge high interest rates; those with access to credit cards
or bank loans would not be the target customers. Car title or auto title
lenders are sometimes called 'predatory lenders' because of the way in which
they prey on those who need cash in emergency situations.  Although lenders
must state the interest rate at the time the loan is made, if it is a
short-term loan, the borrower may not realize that the quoted rate is not
annualized. For example, if a one-month loan rate is advertised at 25%, that
annualized rate is actually 300%."
http://www.investopedia.com/terms/c/car-title-loan.asp (Last visited August
26, 2017).  In the Debtor's case the Automobile Loan resembles a home equity
loan more than the "title loan" described here.  The Automobile Loan was for
an amount that appears to actually exceed the Automobile's fair market value,
the Automobile Loan is not short-term, and the payments are substantial.

[6] The Debtor's chapter 13 plan shows that she intends to file a motion
to value the collateral and pay the creditor through the plan based on the
Automobile's value.

[7] At issue here is whether the nature of the Automobile Loan as an
equity loan rather than for purchase money changes its character as an
"applicable amount" under *Ransom*, (*infra*) for the purposes of the Means Test.

The Debtor has general and priority unsecured debt. Her non-priority unsecured debt totals $286,971, virtually all of which are debts for personal loans.[8] The Debtor has priority tax claims for the year 2015 owed to the California Franchise Tax Board in the amount of $9,985 and to the Internal Revenue Service in the amount of $33,730. Apparently both arise from the 2015 withdrawal of $68,225 from her pension fund. Also in 2015, the Debtor closed out six bank accounts which had a total balance of $23,889.

**Issues Presented**.

1. Whether a debtor has an "applicable amount" for purposes of the Means Test's vehicle-ownership expense deduction when the debt secured by the vehicle is a refinance loan and not a purchase-money loan.

2. Whether the vehicle-ownership expense of §707(b) is a "cap" or an "allowance."

**The Parties' Contentions**

The Debtor contends she has an "applicable amount" for "Means Test" purposes since she is required to make payments on a car loan, notwithstanding that the loan is not a purchase money loan. She also contends that the standard "vehicle ownership expense" is an allowance and available for those debtors with "applicable" expenses.

The chapter 13 trustee, Michael H. Meyer, Esq. (the "Trustee") objects to confirmation of the debtor's proposed chapter 13 plan (the "Objection"), based on the grounds that

---

[8] Also listed is approximately $2,000 owed for ambulance service and some credit card debt.

§1325(b)(1)(B) requires all of the Debtor's "projected disposable income" to be applied to payments to unsecured creditors under the plan.  The Objection hinges on whether payments on the loan (the "Automobile Loan") secured by the Debtor's automobile (the "Automobile") are a deductible "ownership expense."  The Trustee's position raises two issues of apparently first impression in the Ninth Circuit- if the Automobile Loan was not used to *purchase* the Automobile, but instead was an equity loan *secured by* the Automobile, is the Debtor entitled to use the "vehicle-ownership expense" on Official Form 122C-1 (the "Official Form" or the "Means Test") as a deduction from her projected disposable income?  If so, the Debtor's plan payments are sufficient.  The second issue is should the amount specified as the vehicle-ownership expense provided for by §707(b) be treated as a "cap" or as an "allowance?"  If a "cap," then the Debtor may deduct only her actual payment.  If an "allowance," then the full amount of the "vehicle-ownership expense" may be deducted.

The court is not persuaded by the Trustee's arguments and authority and holds that in this case, the Debtor can use the "vehicle-ownership expense."  The court also holds that the "vehicle-ownership expense" is an "allowance" and not a "cap."

There is no disagreement as to the material facts, including that the Debtor properly completed the Official Form. The Trustee argues that the instructions are inconsistent with the Bankruptcy Code and that the Official Form should be completed in a different manner.  Because the court is required to interpret the Official Form to be consistent with the Code and Ninth Circuit authority and because this interpretation

results in a reasonable conclusion that is not inconsistent with any binding authority, the Objection will be overruled.

**Analysis and Conclusions of Law.**

In 2005 the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. 109-8, Apr. 20, 2005, 119 Stat. 23 ("BAPCPA") was enacted "to correct perceived abuses of the bankruptcy system." *Milavetz, Gallop & Milavetz, P.A. v. United States*, 559 U.S. 229, 231-32 (2010). BAPCPA changed prior law by requiring chapter 13 debtors with incomes that are "above-median" to calculate the amount of disposable income available for repayment of unsecured creditors differently than "below-median" income debtors. After calculating their monthly income, the "above-median" income debtor subtracts expenses and payments on secured debt to arrive at "disposable income" available as a dividend to unsecured creditors. Under BAPCPA, some of the expenses deducted from the debtor's income are *actual* expenses, while others are drawn instead from an external schedule of "*allowable*" expenses devised by the Internal Revenue Service. These "allowable" expenses have been deemed by BAPCPA to be "necessary" to the support of the debtor and the debtor's dependents. The "allowable" expenses relevant here are those for transportation.

This "external schedule" is used for both the "presumed abuse" test for chapter 7, and the "projected disposable income" plan payment test in chapter 13. The "external schedule" is a table of expenses developed and updated by the Internal Revenue Service Agency ("National Standards," "Local Standards," or "Standards"). These Standards were developed for use by IRS

agents when evaluating offers in compromise from tax payers. The IRS also created guidelines for the agents' use of the Standards. These are set forth in Internal Revenue Manual, Financial Analysis Handbook §5.15.1.7–5.15.1.10 (the "IRM") https://www.irs.gov/irm/part5/irm_05-015-001.html (all websites last visited August 26, 2017).

The Means Test "result" may cause a chapter 7 bankruptcy case to be dismissed for "presumed abuse,"[9] or for abuse under the "totality of the circumstances."[10] A chapter 7 or 13 case can be dismissed for bad faith,[11] and a chapter 13 plan can be denied confirmation for bad faith[12] or for failure to provide payment of all projected disposable income during the term of the plan.[13]

---

[9] Section 707(b)(2). While the Debtor's case was filed under chapter 13, the analysis of §707(b)(2) as it applies to a chapter 7 case can aid in understanding the application of the Standards.

[10] *In re Ng*, 477 B.R. 118 (9th Cir. BAP, 2012) ("Section 707(b)(1) and (3)(B) of the Bankruptcy Code operate in tandem to allow a bankruptcy court to dismiss a chapter 7 case for abuse of the bankruptcy process based on the totality of the circumstances."

[11] *In re Leavitt*, 171 F.3d 1219, 1224 (9th Cir. 1999) ("'Cause' for dismissal under § 349 has not been specifically defined by the Bankruptcy Code. For Chapter 13 cases, §§ 1307(c)(1) through (10) provide that the bankruptcy court may convert or dismiss, depending on the best interests of the creditors and the estate, for any of ten enumerated circumstances. Although not specifically listed, bad faith is a "cause" for dismissal under § 1307(c)." *Citations omitted.*)

[12] A case must be filed in good faith, §1307(c), §1325(a)(7), and the plan must be proposed in good faith, §1325(a)(3).

> One of the requirements for confirmation of a chapter 13 plan is that it be proposed in good faith. §1325(a)(3). "Good faith" is not defined in the Bankruptcy Code. The Ninth Circuit has held that "the proper inquiry is whether the [debtors] acted equitably in proposing their Chapter 13 plan." *Goeb v. Heid (In re Goeb)*, 675 F.2d 1386, 1391 (9th Cir. 1982). In making that inquiry, the court applies a "totality of the circumstances" test, taking into consideration (1) whether the debtor misrepresented facts, unfairly manipulated the Bankruptcy Code or otherwise proposed the plan in an inequitable manner; (2) the history of the debtor's filings and dismissals; (3) whether the debtor

In the decade-plus since the enactment of BAPCPA, many of the issues that have arisen under §707(b) have been resolved through statutory amendment and precedential case law. For this reason it should be seldom necessary to go further than the Code, the rules, the Official Form, and case law to decide the presumption of abuse or projected disposable income issues. Likewise, unless it is strictly necessary to do so, resort to the IRM for guidance is seldom appropriate and rarely helpful. Here, the court has found it unnecessary to venture beyond the plain meaning of §707(b), the Official Form supplemented with corroborating legislative materials, and court decisions.

**I.   Introduction to the BAPCPA Means Test.**

Much has been written about the inner workings of §707(b)(2) which was implemented as part of BAPCPA, including many published opinions within the Ninth Circuit.[14] In chapter 7 bankruptcy cases debtors turn over all non-exempt property to a chapter 7 trustee for sale and distribution to unsecured creditors and walk away with their exempt property and a fresh

---

intended only to defeat state court litigation; and (4) whether the debtor's behavior was egregious. *Leavitt*, 171 F.3d at 1224 (applying same factors for good faith filing of chapter 13 petition).

*Drummond v. Welsh (In re Welsh),* 465 B.R. 843, 851 (9th Cir. BAP 2012) (*aff'd, In re Welsh,* 711 F.3d 1120 (9th Cir. 2013).)

[13]   Section 1325(b)(1)(B).

[14] Notably, *In re Welsh*, 711 F.3d 1120 (9th Cir. 2013); *In re Egebjerg*, 574 F.3d 1045 (9th Cir. 2009); *In re Kagenveama*, 541 F.3d 868 (9th Cir. 2008) (*overruled en banc by, In re Flores*, 735 F.3d 855, 858-59 (9th Cir. 2013)); *In re Ransom*, 577 F.3d 1026 (9th Cir. 2009) (*aff'd* 562 U.S. 61 (2011)), one of the most recent being, *In re Keller*, 568 B.R. 118 (9th Cir. BAP 2017), explaining the interplay of the automatic stay, BAPCPA, and enforcement of domestic support obligations.

start.  Prior to BAPCPA, the expenses of all chapter 7 debtors were examined under a "reasonable and necessary" standard.  The determination of whether a case had been filed in good faith, or whether granting a chapter 7 discharge would be a "substantial abuse" of the Bankruptcy Code, was delegated by the Code to the discretion of the bankruptcy court.[15]  If the court determined that the chapter 7 debtors had, or should have had, a net income that could be devoted in a chapter 13 to repaying creditors, then those debtors were faced with the choice of dismissal of their chapter 7 case or voluntary conversion of their cases to chapter 13.  In the case of a chapter 13 reorganization, the issue before the court was whether or not the amount devoted to plan payments was sufficient under the circumstances of the case.  Leaving to the court's discretion recognition of "abusive" chapter 7 cases or the sufficiency of unsecured creditors' dividends in chapter 13 led to widely varied outcomes.  In its effort to impose homogeneity, Congress amended the chapter 7 dismissal statute, §707(a) and (b), adding, *inter*

---

[15] Before BAPCPA was enacted §707 read in pertinent part:
    (a) The court may dismiss a case under this chapter only after notice and a hearing and only for cause, including--
    (1) unreasonable delay by the debtor that is prejudicial to creditors;
    (2) nonpayment of any fees or charges required under chapter 123 of title 28; and
    (3) failure of the debtor in a voluntary case to file, within fifteen days or such additional time as the court may allow after the filing of the petition commencing such case, the information required by paragraph (1) of section 521, but only on a motion by the United States trustee.
    (b) After notice and a hearing, the court, on its own motion or on a motion by the United States trustee, but not at the request or suggestion of any party in interest, may dismiss a case filed by an individual debtor under this chapter whose debts are primarily consumer debts if it finds that the granting of relief would be a substantial abuse of the provisions of this chapter. There shall be a presumption in favor of granting the relief requested by the debtor.

*alia*, §707(b)(2)-(3) (made applicable to chapter 13 cases by §1325(b)).  Section 707(b)(2) substituted the previous judicial discretion model with the mandatory application of the Standards.  This uniform set of standard expenses now guides the "disposable income" inquiry. This homogeneity has shortcomings as pointed out in *Ransom v. FIA Card Services, N.A.*, 562 U.S. 61, 70 (2011),[16] where the Supreme Court noted,

> [The debtor] . . . points out a troubling anomaly: Under our interpretation, "[d]ebtors can time their bankruptcy filing to take place while they still have a few car payments left, thus retaining an ownership deduction which they would lose if they filed just after making their last payment." Brief for Petitioner 54. Indeed, a debtor with only a single car payment remaining, [the debtor] notes, is eligible to claim a monthly ownership deduction. *Id.*, at 15, 52. But this kind of oddity is the inevitable result of a standardized formula like the means test . . . .  Such formulas are by their nature over- and under-inclusive. *In eliminating the pre-BAPCPA case-by-case adjudication of above-median-income debtors' expenses, on the ground that it leant itself to abuse, Congress chose to tolerate the occasional peculiarity that a brighter-line test produces."*

*Id., emphasis added.*

After the enactment of BAPCPA the Committee on Rules of Practice and Procedure of the Judicial Conference of the United States (the "Committee") developed Official Forms[17] to implement

---

[16] After *Ransom*, the Supreme Court decided *Hamilton v. Lanning*, 560 U.S. 505 (2010) approving the power of the bankruptcy courts to alter the bright-line application of the Means Test in chapter 13 cases where, pre-confirmation, a change in financial circumstances was certain, or virtually certain, to occur during the term of the plan.

[17] Currently Official Forms 122B and 122C.

10

§707(b)(2).  The relevant provisions of this section have not
changed since that time.  In a chapter 7 the Official Form, or
Means Test, requires debtors to respond to a questionnaire.
Responses determine whether relief in a case would be "presumed
abuse" of the Bankruptcy Code.  For chapter 13 debtors the
responses determine the amount of disposable income the debtors
have to pay to unsecured creditors in the plan.

     The first determination in the Means Test is the
debtors' income.  Debtors are separated into one of two
categories:  above-median income, and below-median income.
Below-median income debtors are finished with the Official
Form when their income is scheduled and can rest somewhat
assured, a chapter 7 case will not be dismissed for abuse,
and a chapter 13 plan will not draw objections to
confirmation based on the disposable income test.[18]

     All above-median income debtors, however, must
continue on to complete the expense section of the Means
Test where they are led through a series of questions
designed to implement the provisions of §707(b)(2).[19]  For
these debtors, deduction of some expenses from income are

_____

[18] After this determination a case cannot be dismissed for §707(b)(2)
"presumed abuse," but only for abuse under the §707(b)(3) "totality of the
circumstances."

[19] The use of BAPCPA's §707(b) is different for chapter 7 and chapter 13
debtors.  For the chapter 13 debtor the statute is used to reveal a debtor's
"projected disposable income" which must be devoted to plan payments.  In
this two-step process, disposable income is first calculated and, second, the
"disposable income is projected into the future and any appropriate
adjustment is made."  *In re Denzin*, 534 B.R. 883, 887 (Bankr. E.D. VA. 2015).
In a chapter 7 case the Means Test serves to "distinguish the honest but
unfortunate debtor who is entitled to chapter 7 relief from the honest but
*less unfortunate* debtor who is capable of repaying all or part of his debts
and who is not entitled to chapter 7 relief."  *Id. Emphasis added*.

11

based on their actual expenses, for other expenses the amount deducted is "deemed" as an "applicable expense" based on the Standards.

    <u>The Standards and §707(b)(2).</u>  A digression is necessary to explain the table of expenses (the IRS Standards), that were incorporated into the Bankruptcy Code by the new subsection §707(b)(2).  The IRS's application of the Standards and their application by the Bankruptcy Code are not similar; reference to the IRM is risky for this reason.  The Standards were designed to provide guidance for *IRS agents* when they consider offers in compromise from taxpayers.

    The Secretary of the Internal Revenue Agency (the "Secretary") is directed, in 26 U.S.C.A. §7122(d)(1), to "prescribe guidelines for [IRS agents] to determine whether an offer-in-compromise is adequate and should be accepted to resolve a dispute."  The instructions to the Secretary in 26 U.S.C.A. §7122 (d)(2)(A) and (B) show that these "guidelines" are not meant to reach the same *uniform result* that was one of the primary purposes of BAPCPA:

> (2) Allowances for basic living expenses.--
>     (A) In general.--In prescribing guidelines under paragraph (1), the Secretary shall develop and publish schedules of national and local allowances designed to provide that taxpayers entering into a compromise have an adequate means to provide for basic living expenses.
>     (B) Use of schedules.--The guidelines shall provide that officers and employees of the Internal Revenue Service shall determine, *on the basis of the facts and circumstances of each taxpayer, whether the use of the schedules published under subparagraph (A)*

*is appropriate* and shall not use the schedules to the extent such use would result in the taxpayer not having adequate means to provide for basic living expenses.

*Id., emphasis added.*

In contrast, BAPCPA's incorporation of the Standards in §707(b) was intended to *remove* discretion from bankruptcy courts in applying the statute in chapter 7 and 13 cases. The only reference in the Bankruptcy Code to the Internal Revenue Service's Standards is in a single sentence in §707(b)(2)(A)(ii)(I).  Since BAPCPA, courts have struggled to apply the statute's effects.  The incorporation of the amounts stated in the Standards was not meant to drag in other IRS materials (*see, In re Kimbro*, 389 B.R. 518, 527-28 (6th Cir. BAP 2008), *rev'd and remanded on other grounds*, 409 F. App'x 930 (6th Cir. 2011). The Standards were created by the Secretary for a purpose inconsistent with Congress's purpose to limit allowable debtor expenses.[20]

To begin with, significant differences distinguish the expenses permitted for *taxpayers* by the IRS and those permitted for *debtors* in bankruptcy.  One example is tithing, specifically permitted by the Bankruptcy Code in §544, §707(b)(1) and (b)(2), but allowed under the IRS

---

[20] Indeed, the IRS now posts a disclaimer on its page stating: "IRS Collection Financial Standards are intended for use in calculating repayment of delinquent taxes. These Standards are effective on March 28, 2016 for purposes of federal tax administration only. Expense information for use in bankruptcy calculations can be found on the website for the U.S. Trustee Program."  (https://www.irs.gov/businesses/small-businesses-self-employed/collection-financial-standards)

13

collection standards as "reasonable and necessary" expenses only if the taxpayer can pay their taxes in full within five years. *George Thompson v. Commissioner*, U.S. Tax Court, CCH Dec. 59,469, 140 T.C. No. 4, (Mar. 4, 2013) (The court found it was reasonable to interpret "health and welfare" as *not* including petitioner's "spiritual" health and welfare).

Secondly, courts have refused to permit expenses for *debtors* which are, however, allowed for *taxpayers* by IRS agents. The court pointed this out in *In re Luedtke*, 508 B.R. 408, 414 (9th Cir. BAP 2014), deciding that debtors were not entitled to take a $200 per month "older vehicle operating expense," because this expense is not listed in the Standards or in the commentary to the Standards. IRS agents, however, may permit this expense when evaluating offers of compromise by taxpayers. *Id*.

Thirdly, while the IRS instructions for the Standards direct a taxpayer to use the Standard or actual amount, "whichever is less,"[21] agents do have discretion under the

---

[21] The IRS website, under <u>Local Standards for California: Housing and Utilities</u>, states: "The taxpayer is allowed the standard amount, or the amount actually spent on housing and utilities, *whichever is less*. If the amount claimed is more than the total allowed by the housing and utilities standards, the taxpayer *must provide documentation* to substantiate those expenses are necessary living expenses." *Emphasis added*. In other words, if the amount is equal or less that the Standard amount, no documentation is necessary. If the amount is more, both documentation and evidence of necessity (as stated in *Wilson v. C.I.R.*) is required.

Under <u>Local Standards: Transportation, under Ownership Costs</u>, the website states: "For each automobile, taxpayers will be allowed *the lesser of*: 1. The monthly payment on the lease or car loan, or 2. The ownership costs shown in the table below." *Emphasis added*. Documentation of actual amounts in excess of the Standard amount is also required of bankruptcy debtors, however, as we see in *Wilson v. C.I.R.*, T.C. Summ. Op. 2013-18, 2013 WL 673161, at *5 (T.C. Feb. 25, 2013), IRS agents have the discretion to disallow the overage. This is inconsistent with the Official Form which

14

statute to allow the taxpayer's actual expense when it exceeds the Standards.  An IRS agent may use the taxpayer's actual expense or the amount listed in the Standard when evaluating an offer-in-compromise and the agency decisions are reviewed by the tax courts for abuse of discretion. *See, Lindsay Manor Nursing Home, Inc. v. Commissioner of Internal Revenue United States Tax Court*, T.C. Memo. T.C. Memo. 2017-50, 2017 WL 1113299, Tax Ct. Rep. (CCH) 60,858, 113 T.C.M. (CCH) 1223, T.C.M. (RIA) 2017-050, 2017 RIA TC Memo 2017-050 ("In its discretion, the IRS may accept an installment agreement if it determines that doing so will facilitate full or partial collection of a tax liability. . . .  Consequently, in reviewing this determination, the Court does not substitute its judgment for that of Appeals and decide whether in its opinion petitioner's installment agreement should have been accepted.  Instead, the Court reviews this determination for abuse of discretion." *Citations omitted.); Lindley v. Commissioner*, U.S. Tax Court, 92 T.C.M. (CCH) 363, T.C.M. (RIA) 2006-229, 2006 RIA TC Memo 2006-229 (Oct. 2006) ("[I]t was not arbitrary or capricious for [the agent] to use national and local standards in determining petitioners' allowable housing and utilities expense, including the second mortgage expense," instead of their actual expenses, because the taxpayer did

---

explicitly directs the debtor to enter those overage amounts in the "other debts" section of the Official Form, thus showing logically that the Standard is a cap.  By now there is no doubt that it was Congress' intent that claims secured by debtors' homes and vehicles, in addition to other collateral, be paid.  *Drummond v. Welsh (In re Welsh)*, 711 F.3d 1120, 1133 (9th Cir. 2013).

not show "they would be unable to provide for basic living expenses if only allowed the national and local standards").

The Standards as used by the IRS is not how the Code contemplates their use, since the Code clearly and unambiguously reads, at §707(b)(2)(A)(ii)(I): "Amounts reasonably necessary to be expended under paragraph (2) . . . *shall be* determined in accordance with [the National and Local Standards], if the debtor [is an above-median income debtor]. *Emphasis added*. A court using the Standard amounts in the same manner they are used by the IRS would nullify this statute by restoring judicial discretion.

The Sixth Circuit BAP case, *In re Kimbro*,[22] provides a well-reasoned explanation of the difference in the use of the Standards by the IRS and as they are incorporated into the Bankruptcy Code.

> The substantial discretion allowed to a revenue officer under the IRM is inconsistent with the purpose of the means test to adopt a uniform, bright-line test that eliminates judicial discretion. Congress intended that there be uniform and readily-applied formula for determining when the bankruptcy court should presume that a debtor's chapter 7 petition is an abuse and for determining an above-median debtor's disposable income in chapter 13. By explicitly referring to the National and Local Standards, Congress incorporated a table of standard expenses that could be easily and uniformly applied; *Congress intended that the court and parties simply utilize the expense amount from the applicable column based on the debtor's income, family size, number of cars and locale. The amounts are entered into the means test form and a determination of disposable income is*

---

[22] Reversed and remanded as being inconsistent with *Ransom*'s "applicable" analysis.

*accomplished without judicial discretion*. The clear policies behind the means test were the uniform application of a bright-line test that eliminates judicial discretion. Plainly, Congress determined that these policies were more important than accuracy. *However, if the IRM were used to determine the amounts of expenses, as the trustee argues, the means test would of necessity again be a highly discretionary test, because under the IRM, a revenue officer is afforded significant discretion in determining a taxpayer's ability to pay a tax debt*. Many paragraphs illustrate this extent of this discretion, as the extended list below demonstrates.

*In re Kimbro*, 389 B.R. 518, 527-28 (6th Cir. BAP 2008), *emphasis added, rev'd and remanded on other grounds*, 409 F. App'x 930 (6th Cir. 2011).

Following this paragraph in the *Kimbro* decision are many examples of IRS agent discretion in interpreting the Standards.

<u>Returning to the Bankruptcy Code and the Means Test.</u>

Section 707(b)(2)(A)(ii)(I), in pertinent part, states:

> The debtor's monthly expenses *shall be* the debtor's *applicable monthly expense <u>amounts specified</u>* under the National Standards and Local Standards, and the debtor's <u>*actual* monthly expenses</u> for the categories specified as Other Necessary Expenses issued by the Internal Revenue Service for the area in which the debtor resides . . . . Notwithstanding any other provision of *this* clause [I], the *monthly expenses*[23] of the debtor *shall not include any payments for debts*.

*Id., emphasis added*.

---

[23] It would have been more accurate to write, "Notwithstanding any other provision of this clause [I], the monthly expense *amounts* of the debtor shall not include any payments for debts."

Debtors are instructed in Part 1 of Official Form 122C "Chapter 13 Calculation of Your Disposable Income," "Calculate Your Deductions from Your Income," to enter the "*amounts* specified" under the "National and Local Standards" (emphasis added).  After entering their household size, debtors are instructed to use the National Standards for the amounts on:  "Line 6.  Food, clothing, and other items; Line 7.  Out-of-pocket health care allowance."

For Lines 8-15, debtors are instructed to use the IRS Local Standards. Based on information from the IRS, the USTP bisected the Local Standards into:  "Insurance and operating expenses," on Line 8, and "Mortgage or rent expenses," on Line 9.[24]  Thus, on Line 8 the debtor enters the amount from the appropriate Standards category for "Insurance and operating expenses," and this amount is deducted from the debtor's income.  On Line 9 the debtor enters the amount from the Standards category for "Mortgage or rent expenses."  Next, on Lines 9a and 9b, the debtor enters the actual average mortgage payment and "*other debts secured by your home.*"  These debt amounts are subsequently *deducted from the Standards amount* (with the result that "no

---

[24] In bankruptcy, allowed secured claims either get paid or their collateral is released; a chapter 13 debtor must propose a feasible plan; and, courts are not allowed the breadth of discretion exercised by IRS agents in evaluating offers-in-compromise.  Without the USTP's separation of housing-standard components, it would be possible for a debtor under the Means Test to receive no deductions from income for utilities and insurance if their mortgage payment exceeded the Standards.  By zeroing out the unified Standard amount a debtor, for example, might be unable to both satisfy the Means Test and propose a feasible chapter 13 plan.  Section §707(b)(2)(A)(ii)(I) was an effort to apply a simple nondiscretionary standard to the universe of debtors.

debt is included in the expenses, §707(b)).  Therefore, if
these secured debts exceed the Standards amount, the
Standards amount listed on line 9c will be zero.  The
entire *debt,* however*,* will be listed on <u>Line 33</u>,
regardless:  "Deductions for Debt Payment: For debts that
are secured by an interest in property that you own,
including home mortgages, vehicle loans, and other secured
debt."  Alternatively, if these secured debts are *less* than
the Standard amount, there will be some amount on <u>Line 9c</u>
which will then be deducted from the debtor's income and the
debt expenses deducted also on <u>Line 33</u>.  This process
created by the Committee in drafting the Official Form both
conforms the Means Test with the statute and eliminates the
concern expressed by the Oversight Committee that the way
the Official Form was drafted permitted "double-dipping."[25]

---

[25] "Section 707(b)(s)(A)(ii) of the code is clear and leaves no room for interpretation.  It delineates calculation methods for two categories of a debtor's expenses.  The two categories of deductions are those set out in the National Standards and Local Standards as issued by the Internal Revenue Service. . . .  Under the first category of deductions, which applies, among other things, to transportation expenses, the "debtor's monthly expenses *shall be* the debtor's applicable expense amounts specified under the Internal Revenue Service National Standards and Local Standards . . . ." (emphasis added).  The IRS National Standards provide a specific allowance for food, clothing, household supplies, and personal care, depending on income and household size.  The IRS Local Standards specify an amount for housing and utilities expenses and a separate amount for transportation expenses, depending on location.  Though the amount of transportation expenses permitted under the IRS Local Standards sets a cap on actual expenses in the context of tax laws, the Act's plain language entitles a debtor to an allowance for this amount for purposes of calculating the means test in the same way that the Act provides an allowance for food and clothing expenses.  This meaning is underscored by the provision immediately following, which applies to other expenses.

Under the same subparagraph of §707(b)(2)(A)(ii), the "debtor's actual monthly expenses for the categories specified as Other Necessary Expenses issued by the Internal Revenue Service for the area in which the debtor resides . . ." (Emphasis added) are authorized as allowable deductions.  The language of this provision is equally unequivocal and, unlike food and transportation expenses, requires itemization of "other necessary" expenses

Line 11, "Local transportation expenses," are divided into
the categories used by the IRS:  Line 12 for "Vehicle operation
expense," and Line 13, "Vehicle ownership or lease expense."  The
Debtors then engage in the same exercise as for housing
expenses.  Debtors may claim the Standards amount for "Vehicle
operation expense" for up to two vehicles on Line 12.  On Line
13a, the debtor is directed to enter "Ownership or leasing costs
using IRS Local Standard."  Then, on Line 13b the average
monthly payment is deducted from the Standards amount for
ownership, leaving the net, either zero or some dollar amount,
on Line 13c as the "Net Vehicle ownership or lease expense."

---

actually incurred by the debtor.  The juxtaposition of the two provisions in
the same sentence makes clear that Congress deliberately adopted different
methods of calculating these two types of expense deductions.  In the first
category a debtor may include an allowance for food, clothing,
transportation, household supplies, and personal care specified in the IRS
standards; in the second category a debtor may include other necessary
expenses only to the extent actually incurred by the debtor. (Fn "The House
Judiciary Committee Report on S. 256, Bankruptcy Abuse Prevention and
Consumer Protection Act of 2005, explains the operation of this provision and
says: "[T]he debtor's monthly expenses . . . must be the applicable monthly
amounts set forth in the Internal Revenue Service Financial Analysis Handbook
as Necessary Expenses under the National and Local Standards categories and
the debtor's actual monthly expenditures for items categorized as Other
Necessary Expenses."  H.R.Rept.No.109-31(Part 1)(2005).)
    The Advisory Committee's overarching obligation in developing the
Official Forms was to faithfully execute the Act's language.  The Act's
language governing the calculation of deductions for transportation expenses
in entry line 22 is clear and compelling." *Oversight of the Implementation
of the Bankruptcy Abuse Prevention and Consumer Protection Act:  Hearing
Before the Subcomm. on Administrative Oversight and the Courts of the S.
Committee on the Judiciary,* 109th Cong. (2006), 156.
    ****************************************************************
    "The second concern suggests a possible double counting of a debtor's
mortgage expenses as part of the means-testing calculations.  Each debtor is
entitled to a housing and utilities allowance as determined by the IRS.  But
because the debtor is also entitled to a deduction for actual mortgage
payments, the means-testing form (Official Form B22A) reduces the IRS
allowance by the actual mortgage payment to prevent double counting.  The
form is consistent with the statutory requirement, giving effect both to a
debtor's mortgage payments actually made and the general housing and utilities
allowance without double counting."  *Id.,* 178

20

This amount includes no payment on debt; the entire payment on the debt is listed later and deducted from income on Line 33.

The applicable amount specified in the Standards is determined by the debtor's household size and geographical location and is unrelated to monthly debt payments. The Standards are assuredly not a cap because secured debt is listed on Line 33 and deducted from the Standards amount. This way the Official Form tracks the statute. Congress was concerned about debtors "double dipping" the deduction of the entire applicable Standards amount and then another deduction for the secured payment on Line 33.

Application of the Standards under the plain language of §707(b)(2) is limited by decisions in the two U.S. Supreme Court cases, *Ransom v. FIA Card Services, N.A. (In re Ransom)*, 562 U.S. 61, 69-70 (2011) (in order for a Standard to be "applicable," the debtor had to actually incur some expense in that category), and *Hamilton v. Lanning*, 560 U.S. 505, 519-27 (2010) ("projected disposable income" is debtor's disposable income, taking into account changes certain or virtually certain to occur). The Ninth Circuit more finely-tuned "good faith" in *Drummond v. Welsh (In re Welsh)*, 711 F.3d 1120, 1134 (9th Cir. 2013), holding that there is no lack of good faith for merely continuing to pay secured creditors for "luxury" items.

Based on the Means Test, the chapter 13 debtor proposes a plan payment. Upon a timely objection by the chapter 13 trustee or holder of an allowed unsecured claim, and unless the plan pays 100% of the allowed unsecured claims, the court must

inquire whether the debtor is devoting all "projected disposable income" to plan payments.[26]  The Debtor here is an "above-median-income debtor."[27] Her "projected disposable income" is determined under §707(b)(2) which, as we have seen, incorporates the Standards.

Only the chapter 13 trustee or an allowed unsecured claimant may bring an objection to confirmation raising §1325(b)(1)(B).  The objector has the initial burden of proof to show that the debtor is not applying all disposable income to plan payments.  *Itule v. Heath (In re Heath)*, 182 B.R. 557, 560-61 (9th Cir. BAP 1995) (citations omitted).  The burden then shifts to the debtor, "as the party with most access to proof on the point, to show . . . that the objection lacks merit." *In re Crompton*, 73 B.R. 800, 809 (Bankr. E.D. Pa. 1987) (citation omitted).

**II.  The Debt Secured by the Automobile is a "Vehicle-Ownership" Expense.**

The Trustee logically argues, "an interpretation of a code section should not create a result wherein the Debtor gets more than they need.  If so, then she is not paying the 'maximum' she can afford."  However, §707(b)(2) mandates

---

[26] The 1984 amendment of the Code subsumed the good faith factors of §1325(a) into "ability to pay" under §1325(b) for confirmation.  8 *Collier on Bankruptcy* ¶1325.11[1].  The ability to pay test became a "floor and a ceiling" for payments.  If more than an affordable amount was proposed, the plan would not meet the "feasibility" test.  BAPCPA changed the inquiry from the debtor's actual income and expenses to create a "bright line test" employing §1325(b), rather than the good faith test, to determine whether the plan met the disposable income test.  *Id*.¶1325.11[2].

[27] An "above median income" debtor has an annual income more than the median family income of the state in which they live and based on their household size.

certain allowed expenses "shall be" the Standard.
Predictably, removing discretion in favor of a standardized
schedule of allowed expenses may result in occasional
anomaly.  This issue was raised on December 6, 2006, before
a hearing by the Senate Judiciary Committee's Subcommittee
on Administrative Oversight and the Courts.  *See*, *Oversight
of the Implementation of the Bankruptcy Abuse Prevention
and Consumer Protection Act:  Hearing Before the Subcomm.
on Administrative Oversight and the Courts of the S.
Committee on the Judiciary,* 109th Cong. (2006) (the
"Oversight Committee").  In response, the Committee on
Rules of Practice and Procedure of the Judicial Conference
of the U.S. (the "Rules Committee") explained that it
wrestled with the "shall" and the "notwithstanding"
language when drafting the Official Forms.  The Rules
Committee could have sensibly reconciled this by providing
the debtors with the benefit of the Standards amount, or
allowance, and the secured debt.  It considered that
harmonization with the Code, however, explaining its
reasoning, said:

> The [Rules] Committee rejected these arguments as
> creating a situation in which debtors could "double
> dip" in a manner that did not seem to the Committee to
> be consistent with the intent of Congress even if a
> statutory construction argument could be asserted in
> support of such a position.
> A debtor who opts to live in a very cramped
> apartment in order to save money to cover the costs of
> parochial school for his or her children would be
> penalized under the proposal [to limit the Standard to
> the actual expense].

The uniform application of the IRS Standards leaves these lifestyle choices to the debtors rather than imposing an obligation on the courts to make decisions about the propriety of any particular expenses being allowed or disallowed. *Id.*, 182-83. The Trustee does not cite any authority for his contrary proposition that the definition of "applicable" should be narrowed to exclude, as an "applicable" expense, the payments on the Automobile Loan.

This argument raises an issue of first impression in the Ninth Circuit. The court begins with the plain meaning of the statute. *Lamie v. U.S. Trustee*, 540 U.S. 526, 534 (2004). Second, the court will refer to the Rules of Bankruptcy Procedure and the Official Form.[28] Finally, where the plain meaning of a statute *cannot* be determined by using the canons of statutory interpretation,[29] then legislative history and analogies to decisions by the Supreme Court, the Ninth Circuit Court of Appeals, District

---

[28] "The Bankruptcy Rules and Forms govern procedure in cases under title 11 of the United States Code. The rules shall be cited as the Federal Rules of Bankruptcy Procedure and the forms as the Official Bankruptcy Forms. These rules shall be construed to secure the just, speedy, and inexpensive determination of every case and proceeding." FRBP 1001.

"As a general matter, the Code defines the creation, alteration or elimination of substantive rights but the Bankruptcy Rules define the process by which these privileges may be effected." *In re Hanover Indus. Mach. Co.*, 61 B.R. 551, 552 (Bankr E.D. Penn. 1986);

The Official Bankruptcy Forms and the Federal Rules of Bankruptcy Procedure are intended to govern procedures in cases under the Code, and they enjoy a presumption of validity. *See* Fed. R. Bankr. P. 1001; Fed. R. Bankr. P. 9009 (forms shall be construed to be consistent with the Rules and the Code); *Schwab v. Reilly*, 560 U.S. 770, 779 n. 5 (2010) ("The forms, rules, treatise excerpts, and policy considerations . . . must be read in light of the Bankruptcy Code provisions that govern this case, and must yield to those provisions in the event of conflict."

[29] *In re Schwartz-Tallard*, 803 F.3d 1095, 1103 (9th Cir. 2015) ("When the language of a statute is ambiguous, canons of statutory interpretation are useful rules of thumb to help courts determine the meaning of legislation.")

Courts, and the Ninth Circuit Bankruptcy Appellate Panel, should be employed.[30]  Only if §707(b) and the Official Form cannot be reconciled concerning the use of the incorporated IRS National and Local Standards will the court consult the IRM.[31]

The unpublished case, *In re Tydingco*, 2016 WL 1033878 (No. 1:14-bk-00070, Bankr. D. Guam, Jan. 27, 2016), is a good example of a court consulting the IRM.  The *Tydingco* court had to reconcile the mandatory language of §707(b)(2) with the fact that 2012 the IRS stopped providing Local Standards for Guam.  The creditor argued that the 2011 Local Standards should be applied, while the debtors said their monthly expenses should be determined using the current Local Standards for a similar state, such as Hawaii.  The court rejected the creditor's position, saying that the IRS did not simply stop updating the Local Standards, but has "jettisoned them entirely."  *Id.*, *7.

---

[30] *See*, *Strother v. Southern California Permanente Medical Group*, 79 F.3d 859, 865 (9th Cir. 1996) ("When interpreting state law, federal courts are bound by decisions of the state's highest court.  'In the absence of such a decision, a federal court must predict how the highest state court would decide the issue *using intermediate appellate court decisions, decisions from other jurisdictions, statutes, treatises, and restatements as guidance*.'") (Citations omitted.)

[31] The Supreme Court has said,

> Although the statute does not incorporate the IRS's guidelines, courts may consult this material in interpreting the National and Local Standards; after all, the IRS uses those tables for a similar purpose—to determine how much money a delinquent taxpayer can afford to pay the Government. *The guidelines of course cannot control if they are at odds with the statutory language.  Ransom v. FIA Card Services, N.A.*, 562 U.S. at 72, *emphasis added*.

*Ransom v. FIA Card Services, N.A.,* 562 U.S. 61, 74 (2011).

Likewise, the court disapproved the debtors' approach, finding that, "[i]t would be very difficult to accurately select a similar state," and noting that the IRM advises IRS agents against this solution.[32]  *Id.*  The court, instead, permitted the debtors to deduct their actual "reasonably necessary expenses that would otherwise be covered in local standards."  *Id.*, *7.[33]  Citing *Ransom*, the court said:

> To the extent that the IRM provides that the "submission of living expenses should generally be accepted, provided they are reasonable" in U.S. Territories, the IRM matches the Bankruptcy Code for below-median income debtors and the Court's holding for above-median debtors in the absence of local standards.  See IRM §5.15.1.7(2).  Of course, because the Bankruptcy Code expresses a contrary mandate for the rest of the means test-that expenses *shall be* the national expenses-the code controls the IRM in all other respects.

*Id.*, emphasis original.

Because Lopez' monthly income was about $660 over the "median," she used §707(b)(2) to calculate her "monthly disposable income" available to pay unsecured creditors. According to her amended Means Test, this sum was $548.05. The Debtor has proposed a plan with payments of her total net income, as shown in schedules I and J, of $1,415.65, for 60 months.  This amount will pay the Debtor's secured

---

[32] The court also declined the debtors' suggestion that the court adjust the 2011 Local Standards for inflation.

[33] The exception was the Local Standards for vehicle expenses, because those standards are national and regional in character, with Guam being part of the West region of the U.S. Census Bureau.  *Id.*, at *8.

debt, unsecured priority debt, and a 7.34% dividend to general unsecured creditors.

According to the Trustee, the Debtor's plan would result in a *pro rata* distribution to unsecured creditors of $21,291.21,[34] however without the "vehicle-ownership expense" the Debtor's "monthly disposable income" would be $808.67 resulting in a *pro rata* distribution to unsecured creditors of $48,520. Citing several published and unpublished out-of-circuit cases, the Trustee's asserts that, because the Automobile Loan was incurred within a year of filing and was not used to purchase the Automobile, the Debtor is not entitled to the Standards' vehicle-ownership expense.[35] The Trustee contends that the monthly Automobile Loan payment should be included on Line 33 as "other secured debt" on the Means Test. (As explained *supra* the debt is to be included on Line 33 in any case.) If the Trustee's position was accepted, the Debtor would be deprived of the difference between the Standards amount for the vehicle-ownership expense on Line 13 of $517 and her actual Automobile Loan payment of $ 256.48.

Courts have straddled the issue of the treatment of non-purchase money security interest loans secured by

---

[34] The Trustee contends that based on the Debtor's amended Means Test her plan must provide $32,883 to unsecured creditors instead, and so, regardless of the outcome here, the plan cannot be confirmed. The Debtor initially claimed a deduction of $200 a month for her grandchildren's benefit, however in response to the Trustee's objection the Debtor has agreed to increase her plan payments by $200 per month.

[35] The Trustee does not argue that the Debtor's plan was filed in bad faith and so the proximity in time of the debt at issue is not relevant to the analysis.

vehicles. The analysis in these decisions is often muddied
by reference to various portions of the IRM when the issue
before these courts was actually the debtor's good faith.
Post-*Ransom*, some courts have held that non-purchase money
auto loans do not qualify as an "applicable expense."[36]
Those decisions, however, are driven by the debtor's lack
of good faith, not the reasoning of *Ransom*.

　　　　For example, in *In re Alexander*, 2012 WL 3156760
(Bankr. W.D. Mo. August 1, 2012), only *four days* before
filing bankruptcy the debtors took out a $513 loan secured
by one of their cars and then asserted entitlement to the
vehicle ownership deduction resulting in negative
disposable income. The debtors' plan proposed no payment to
their unsecured creditors. *Id.*, at *4. In another case,
*In re Sires*, 511 B.R. 719 (Bankr. S.D.Ga. 2014), the court,
with little analysis, decided against the debtor with a $74
monthly payment on a non-purchase money debt against the
vehicle and who proposed no payment to unsecured creditors.
The court referred to decisions by other courts that "based
their opinion on language contained in the IRM interpreting
the National and Local Standards" as to whether or not the
debtors were entitled to the "vehicle-ownership expense".
*Id.*, 724. As explained, *supra*, reference to the IRM is not
appropriate in determining the issue presented to the
court. The language of the IRM and other IRS materials are
internally inconsistent regarding the scope of the

---

[36] *See, e.g., In re Alexander*, 2012 WL 3156760 (Bankr. W.D. Mo.); *In re King*, 497 B.R. 161 (Bankr.N.D.Ga.2013); *In re Sires*, 511 B.R. 719 (Bankr. S.D.Ga.2014).

applicable expense and, given the latitude delegated to IRS
agents, not likely to have been intended to create a bright
line.  Likewise, in *In re King*, 497 B.R. 161 (Bankr.
N.D.Ga. 2013), the court had before it a debtor who, forty-
one days before the filing, incurred a $585.20 title lien
secured by a ten-year old automobile.  The chapter 13
trustee did not raise a good faith issue and the court
followed the reasoning in the *Alexander* case, simply
finding that the title lien was not an applicable expense.

The Trustee's argument must rely on the reasoning in *Ransom*;
to prevail he must convince the court that the Debtor, like
Ransom, does not have an "applicable" expense.  Ransom owned the
vehicle free and clear and therefore had no payment on any debt
secured by the vehicle.  Here, the Debtor must make payments on
the debt secured by her Automobile.  The court must decide
whether the Debtor has an "applicable" expense for the purposes
of § 707(b)(2)(A)(ii)(I), which is the case if "the debtor will
*incur that kind of expense* during the life of the plan." *Ransom*,
562 U.S. at 70, *emphasis added*.  The payment on a debt secured
by a vehicle, during the life of the plan, is "that kind of
expense" in this case.

A court in a different division of the same Northern
District of Georgia as the court in *King*, came to the opposite
conclusion in a reported decision three years later in *In re
Feagan*, 549 B.R. 811, 819 (Bankr. N.D.Ga. 2016).  There, the
debtor owed $3,085 on his car to a pawnbroker and had to pay
$51.43 per month to retain the car.  The court in *Feagan* decided
that reference to the IRM for resolution was unhelpful.

A review of these parts of the IRS statements on the subject reveals that, in some places, the materials describe Ownership Costs as "monthly loan or lease payments." In other places, the materials refer to Operating Costs as "monthly allowances for the lease or purchase" of automobiles or a "vehicle payment (lease or purchase)."

So how does an IRS employee decide whether payments on a nonpurchase-money obligation are allowable as an Ownership Cost? Perhaps the employee consults a lawyer who parses the language of the text as a matter of statutory construction and applies various maxims to conclude that the specific references to the "lease or purchase" of a vehicle require a conclusion that nonpurchase-money obligations are excluded.

*In this Court's judgment, the IRS Standards and interpretive materials should not be interpreted in the way that courts and lawyers read statutes. The reason is that, unlike statutes in general and the provisions of the means test in particular, the IRS interpretive materials and the Standards themselves do not establish mandatory rules that IRS employees must follow.*

*Id.*, 817, *emphasis added*.

*Feagan* isolated the issue as, "[W]hether the Ownership Costs Standard-and by extension the [projected disposable income] test-treats car payments differently depending on whether the car is encumbered by a nonpurchase-money obligation." *Id.*, at 819. In *Feagan,* the chapter 13 trustee made the same objection to confirmation made here. The *Feagan* court analyzed *Ransom* in depth and determined that its decision was consistent with *Ransom*.

Based on these observations, *Ransom* could require a conclusion that a debtor who must pay a nonpurchase-money obligation to retain a car has an expense within the Ownership Costs category and that,

therefore, the category is "applicable" to him under
the statutory language of §707(b)(2)(B)(i)(I).

Either argument is sensible. Because the question
of whether the Operating Costs category covers
nonpurchase-money obligations was not before the
*Ransom* Court, however, the language it used to
describe what the category covers does not control the
issue one way or another. The Supreme Court discussed
only the issue before it; if the Court thought that it
was addressing this issue, nothing in the opinion
makes that clear.

*Feagan*, 549 B.R. at 816.

After determining that *Ransom* did not suggest a different
outcome, *Feagan* proceeded to analyze the issue, overruling the
Trustee's objection and confirming the debtor's plan.

In considering Congressional purpose in context
of that issue, the proper focus is not on the
Congressional intent to make a debtor pay the maximum
he can afford. Rather, the inquiry properly focuses on
the intent to establish a formula to determine "amounts
reasonably necessary to be expended" for purposes of
the [projected disposable income] test. *See Ransom*,
562 U.S. at 65, 131 S.Ct. at 721-22. The *Ransom* Court
observed that BAPCPA's means test provisions
supplanted pre-BAPCPA practice that calculated
reasonable expenses on a case-by-case basis, with
"varying and often inconsistent determinations." *Id*.
Congress defined categories of reasonable
expenses. One of them is an allowance for Ownership
Costs that is applicable to a debtor with a car
payment. The purpose of that must be to permit the
debtor to keep the car so that he has necessary
transportation. To accomplish that objective, it makes
no difference whether the debt is purchase-money or
non-purchase money—the debtor must make the car
payments to keep the car. If Congressional purpose is
relevant to determination of the question at all,
treating both types of encumbrances the same way
furthers the Congressional purpose of permitting a
debtor's retention of an encumbered car.  *Id*.

In an unpublished order the district court reversed and remanded the *Feagan* case, concluding that the debtor was not entitled to claim the loan payment as a "vehicle-ownership expense". That district court cited *Ransom*, then turned to the IRM, Section 5.8.5.22.3, "[expenses are allowed for purchase or lease of a vehicle], saying, "This conclusion follows from the specific language used in the IRM coupled with the policy reasons for the enactment of BAPCPA outlined in *Ransom.*" *Id.*, *18-19. *In re Feagan*, 4:16-CV-00108-HLM, (N.D.Ga., Sept. 6, 2016).[37]

This court respectfully disagrees with the district court reversal. The district court appears to have relied on the IRM. This court is persuaded by the well-reasoned decision of the *Feagan* bankruptcy court and agrees there is no authority in the Code or Standards to treat purchase-money and non-purchase-money loans secured by vehicles differently. In *Feagan* it might have been appropriate to deny confirmation for bad faith (although the bankruptcy court specifically stated that the trustee had made no such suggestion, *id*, fn. 14). This court is convinced that the Automobile Loan should not be treated differently for Means Test purposes based solely on the fact that it is a refinancing or equity type of transaction instead of a purchase-money or lease transaction.

In an unpublished summary order denying confirmation in the case, *In re Carroll*, 12-41350 (Bankr. Idaho, April 15, 2013), the court concluded that a "title loan" was not an "applicable expense" for Means Test purposes. That court based its

---

[37] WestLaw shows the case, *In re Feagan*, 549 B.R. 811, as having no history and there is no indication, there, that the case was reversed and remanded.

conclusion on the characteristics of "title loan" as a "short-term loan with a high interest rate." *Id.* *1. It noted that the debtors had "pawned" their automobile on more than one occasion, using the collateral in the vehicles "to obtain cash to help make ends meet." *Id.* *5. The court also referred to the IRM, which it found "not exactly clear on this point." *Id.* *3. Admitting it was a "close call," the *Carroll* court was persuaded that the intent of the deduction was to accommodate the costs of acquiring a vehicle. *Id.* *4. As explained, *supra*, this court is not so persuaded.

The most recent Ninth Circuit guidance related to this issue is the Bankruptcy Appellate Panel's unpublished opinion, *In re Drury*, 2016WL4437555, BAP No. CC-15-1441, Bk. No. 2:15-bk-17125 (Aug. 23, 2016), reversing the decision of the bankruptcy court. Although the issue presented in *Drury* was slightly different, and *Drury* is unpublished, the reasoning of the BAP informs the court's decision here. In *Drury,* the debtor used a car that had been purchased by her sister. The debtor made the payments on her sister's loan which was secured by that car. In Drury's chapter 7 case, the U.S. Trustee, while acknowledging that if Drury ceased making the payments she would lose the vehicle, argued that, as a matter of law, Drury was prohibited from taking the vehicle-ownership expense because she was not legally obligated on the debt. *Id.*, *6.[38] The *Drury* Panel concisely posed this question: "When a debtor does not own an automobile but *makes monthly lease or loan payments as a*

---

[38] The Trustee argues that *Drury* supports his position, however the court is not so persuaded.

33

*prerequisite to his or her continued possession and use of a vehicle*, may the debtor claim an expense allowance under the means test for car 'ownership' expenses?'" *Id*., *1, emphasis added. The BAP answered "yes." [I]t is undisputed that Drury will lose possession of the automobile unless she continues to make payments to the lender.  This undisputed fact establishes for means test purposes that the relevant IRS local transportation expense standard of $517 for car ownership expenses is "applicable" to Drury and thus she is entitled to claim this amount for purposes of determining whether her chapter 7 case filing was presumptively abusive under §707(b)(2).  *Id*., *2.

 The BAP did mention the IRM in passing, but, consistent with the bankruptcy court in *Feagan*, found nothing dispositive. This court's conclusion is consistent with the BAP's *Drury* decision.  It is undisputed that the Debtor will "lose possession of the automobile unless she continues to make payments to the lender," and thus the relevant Standards expense is "applicable" to the Debtor.  *Id.; Ransom,* 562 U.S at 69.

  The plain meaning of the statute, consistently interpreted with the language in the Official Form, leads to the reasonable conclusion that the Debtor has an "applicable expense" for purposes of the vehicle-ownership expense" deduction.  The IRS's use of the Standards differs in policy and purpose from its application by the Bankruptcy Code, as explained *supra*.  The court relies on "the text, context, and purpose of the statutory provision," as did the Supreme Court in *Ransom*, 562 U.S. at 64. The Supreme Court in *Ransom* did not mandate a court's consultation of the IRM.  *Id*., 72 ("[C]ourts *may* consult the

material in interpreting the National and Local Standards."
*Emphasis added*.)  The IRM is not helpful here.

The Debtor has a vehicle encumbered by a car loan, a legitimate ownership expense albeit not a purchase-money expense.  Here, the trustee asks the court to narrow the meaning of "applicable" by confining it to purchase-money debts.  However, the Trustee provides no basis in the law supporting this limitation and the court is not persuaded that such narrowing is consistent with congressional intent in BAPCPA.  Nothing in the National or Local Standards or the Code imposes a "purchase-money loan" restriction on the debtor.[39]  Because the court is persuaded that the debtor is entitled to take the Standards amount for "vehicle-ownership" the court must decide whether that Standard is a "cap" or an "allowance."

**III.  The "Vehicle-Ownership" Expense of §707(b) is an "Allowance," Not a "Cap."**

The Trustee's alternative argument has been addressed by bankruptcy courts in the Ninth Circuit as well as by other circuit courts.  But, there is no precedent that binds this court to either classification.  There is no need to refer to the IRM to resolve the issue because both the statute and the Official Form are clear and unambiguous.  The two fit easily together to arrive at a result that is logical and consistent with the intent of Congress.  The statute provides that the

---

[39] The *Ransom* court acknowledged that the Means Test is, by its nature, "over-and under-inclusive". *Ransom*, 562 U.S. at 78. The trustee here has not shown that the Standards or the IRM clearly exclude non-purchase money loan payments from "ownership expenses."  Rather, the trustee urges bisection and exclusion of a type of "ownership expense" (loan payments) prior to including the deduction from disposable income without direct support.

debtor's monthly expenses *shall be* the amounts under the Standards (an allowance); after deducting the secured payment that permits the debtor to claim an applicable amount from the Standard amount, the debtor is instructed to enter the entire secured debt on <u>Line 33</u>. Logically, if the Standards amount was a cap, the debtor would not be able to enter the entire debt payment on <u>Line 33</u>. In that case the debtor would be unable to both, confirm a feasible plan, and comply with Congressional intent that secured creditors be paid. (*See, Drummond v. Welsh (In re Welsh)*, 711 F.3d at 1133-34.

When the Oversight Committee expressed concerns about the possibility debtors would "double dip," the Rules Committee explained, that possibility is eliminated because debtors deduct their actual payment on their real property or vehicle from the allowance and are only allowed the difference. Accordingly, if the payment on the secured debt is more than the allowance, the amount shown on the line for the Standards would be zero. If the Standards amount was a cap, double dipping would not have been a concern. On the Official Form no debt is included as an expense under the Standards amounts and thus no "double-dipping."

Before *Ransom,* several circuit courts held that debtors could deduct the "vehicle-ownership" Standard amount even if they owned their automobiles outright. Section 707(b)(2)(A)(ii)(I) reads:

> The debtor's monthly expenses *shall be* the debtor's *applicable monthly expense* amounts *specified under the National Standards and Local Standards*, and the debtor's *actual monthly expenses* for the *categories specified as Other Necessary Expenses* issued by the Internal Revenue Service . . . .

*Id., emphasis added.*

Those courts distinguished the term "applicable" from "actual," reasoning that Congress had purposely used these two different terms in the same statute when referring to expenses determined under the National and Local Standards, and those in the "Other Necessary Expenses" category. *In re Coffin*, 435 B.R. 780 (1st Cir. BAP 2010) (term "applicable" as used in the "means test" had to be contrasted with the term "actual" as used elsewhere in the same provision, and did not require that debtor *actually* have such an expense.); *In re Pearson*, 390 B.R. 706 (10th Cir. BAP 2008) (above-median-income debtors entitled to deduct "vehicle-ownership expense" for vehicle owned outright- "applicable" not equated with "actual," as used in permitting debtors to deduct "actual monthly expenses" for Other Necessary Expenses.); *In re Kimbro*, 389 B.R. 518 (6th Cir. BAP 2008) ("applicable" had to be contrasted with "actual" and did not require debtors to genuinely have such an expense.). Although *Ransom* ended this line of decisions, that analysis remains persuasive. *Ransom* held that the word "applicable" meant that the debtor had to *actually incur some expense in this category* in order to deduct the Standards "vehicle-ownership" cost. As the court observed in *Lynch v. Jackson (In re Jackson)* 853 F.3d 116 (4th Cir. 2017):

> In *Ransom v. FIA Card Servs.*, 562 U.S. 61, 131 S.Ct. 716, 178 L.Ed.2d 603 (2011), the Supreme Court was tasked with interpreting 11 U.S.C. § 707(b)(2)(A)(ii)(I). It held that an expense is "applicable," as used in §707(b)(2)(A)(ii)(I), "only if the debtor will incur that kind of expense during the life of the plan." *Ransom*, 562 U.S. at 70, 131 S.Ct. 716. However, the Court expressly declined to reach

the issue of "the proper deduction for a debtor who has expenses that are lower than the amounts listed in the Local Standards." *Id*. at 75 n. 8 (*emphasis in original*).

This court must now address the issue that the Supreme Court declined to reach in *Ransom*. Based on the plain language of the statute, we hold that a debtor is entitled to deduct the full National and Local Standard amounts even if they have actual expenses below the standard amounts.

*Id*. at 121.

The Trustee is correct that if the Official Form is inconsistent with the Code, then the Code prevails—and that the Official Form has been changed in the past to be consistent with Supreme Court decisions.  The Trustee cites several cases where courts have decided the Official Form was inconsistent with the Code.  The Trustee also concedes the Official Forms should be construed to be consistent with the Federal Rules of Bankruptcy Procedure and the Code.

In *In re Wiegand*, 386 B.R. 238, 241-42 (9th Cir. BAP 2008), the BAP said that a business debtor could not deduct business expenses before the median-income test was applied.  The Official Form permits the debtor to deduct the business expenses from the gross income, before the determination of above or below-median income is made. This Official Form directly conflicted with the Code in *Wiegand*, because §1325(b)(2)(B), "provides that business deductions are taken from the debtor's *current monthly income* to arrive at disposable income under § 1325(b)(2)." *Id.*, emphasis added.

The only circuit court of appeals to date that
squarely addressed the "cap" or "allowance" issue presented
to this court appears to be the January 2017 opinion in
*Lynch v. Jackson,* 853 F.3d at 116.  This appeal from the
bankruptcy court's denial of a motion to dismiss the debtor's
chapter 7 case for abuse was certified for direct appeal in
order to resolve a split among the courts in that circuit.
The *Lynch* court framed the issue:

> We granted the appeal as to the following
> question: whether 11 U.S.C. §707(b)(2) permits a debtor
> to take the full National and Local Standard amounts
> for expenses even though the debtor incurs actual
> expenses that are less than the standard amounts.  We
> conclude that debtors are entitled to the full
> National and Local Standard amount for a category of
> expenses if they incur an expense in that category.

*Lynch v. Jackson,* 853 F.3d at 116.

In *Lynch v. Jackson* there was no dispute that the
debtors had correctly followed the instructions in
completing the Means Test.  Relying on the plain language
of the statute, the rules of statutory interpretation, and
*Ransom*, the court made short work of the Bankruptcy
Administrator's argument, that the efforts of the debtors
were futile because those instructions were incorrect.
Here, the language is quite clear.  Once an expense is
incurred [under the holding in *Ransom*], the "[t]he debtor's
monthly expenses *shall be* the debtor's applicable monthly
expense amounts *specified* under the National Standards and
Local Standards." 11 U.S.C. § 707(b)(2)(A)(ii)(I) (*emphases
supplied*).  A debtor is entitled to take the full amount of

the National and Local Standards if they incur an expense

in that category. *Id.*, 120, *emphasis original*.

    While not binding precedent on this court, the court is

persuaded by the decision in *Lynch v. Jackson* which it finds is

consistent with *Ransom* and more persuasive lower court

decisions.[40]

**IV. The Trustee's "Notwithstanding Clause" Argument.**

    Section 707(b)(2)(A)(ii)(I) reads:

> The debtor's monthly expenses *shall be* the
> debtor's *applicable monthly expense* amounts *specified
> under the National Standards and Local Standards*, and
> the debtor's *actual monthly expenses* for the
> *categories specified as Other Necessary Expenses*
> issued by the Internal Revenue Service . . . . Such
> [other necessary] expenses shall include reasonably
> necessary health insurance, disability insurance, and
> health savings account expenses for the debtor, the
> spouse of the debtor, or the dependents of the debtor.
> *Notwithstanding any other provision of this clause*,
> *the monthly expenses of the debtor shall not include
> any payments for debts*.

*Id., emphasis added.*

    The Trustee argues that since the "notwithstanding

clause" excludes secured debt from "expenses," the

Standards are inapplicable. As explained, *supra*, no

secured debt *is* included in the Standards-the *amount* of the

---

[40] The legislative record also supports this conclusion. The response
to concerns raised by the Oversight Committee during the hearings illustrate
the reasoning of the Rules Committee:
    "Though the amount of transportation expenses permitted under the IRS
Local Standards sets a cap on actual expenses in the context of tax laws, the
Act's plain language entitles a debtor to an allowance for this amount for
purposes of calculating the means test in the same way that the Act provides
an allowance for food and clothing expenses. This meaning is underscored by
the provision immediately following, which applies to other expenses."
*Oversight of the Implementation of the Bankruptcy Abuse Prevention and
Consumer Protection Act: Hearing Before the Subcomm. on Administrative
Oversight and the Courts of the S. Committee on the Judiciary*, 109th Cong.
(2006), 156.

40

monthly secured debt payment is subtracted from the Standards amount.  If a debtor will incur a debt during the life of the plan in the applicable category, then they are entitled to the applicable Standards amount.  *See, Ransom*. The debtor's monthly payment on the secured debt adjusts the Standards amount downward resulting in the debtor deducting at least the Standards amount.

In a case that supports the Trustee's argument, *In re Fields*, 534 B.R. 126 (E.D. N.C. 2015), the court interpreted the "Notwithstanding" clause as excluding any *debt* from being deducted under the Standards on the Means Test, whether it was a mortgage used to purchase a home or a loan incurred to buy a car, because these were secured *debts*, not expenses.  Only lease and rent payments, for example, could be included as deductions from the Standards.  The *Fields* court applied the plain meaning of the statute without considering consistency with the Official Form or referring to the IRM.  The Official Form directs debtors specifically to deduct the amounts of their mortgage payments and car loan payments from the Standards amounts while the IRM clearly contemplates inclusion of mortgages and car payments in the Standards calculation.

The Trustee submitted a supplemental brief in support of his "Notwithstanding Clause" argument including a copy of the unpublished case, *In re Bartolo*, 2015 WL 1546158 (Bankr. E.D. N.C., Mar. 31, 2015) ("Secured debts may only be deducted pursuant to [Line 33 'Other Necessary Expenses']").  The court in *Bartolo* found the Local

Standards inapplicable to the debtor's home mortgage
payments and, "thus, the Debtor may not take the deductions
on Lines 25B and 28. The Debtor may only take those
deductions on Lines 47 and 48 relating to his secured debt
payments to SunTrust and Fort Bragg". *Id*. 10.  *Bartolo*
suggested the Official Form should be changed to "remove any
reference to "mortgage" or "ownership" to clarify that the
deduction is only applicable to expenses, not payments on
secured debts. "These lines would thus be 'applicable' only
if a debtor leased a home or vehicle, and had no secured
debt that would fall into the relevant category." *Id*.
Because amounts specified under the Standards are now
incorporated into the Code, and because the provisions of
the Code should be read harmoniously, it is more reasonable
to construe the Official Form as reconciling the
"Notwithstanding Clause" and the amounts specified to be
deducted under the Standards, than to follow the
proposition stated in *Fields* and *Bartolo*.

In a subsequent published 2015 case from the same
district, *In re Jackson*, 537 B.R. 238 (Bankr. E.D.N.C.
2015), the court decided that the Official Form and the
"Notwithstanding Clause" are harmonized.  The *Jackson*
court, agreeing with *In re Scott*, 457 B.R. 740 (Bankr. S.D.
Ill. 2011), said,

> The trustee's reading, the *Scott* court wrote,
> would require rejection of a portion of the form as
> "incorrectly designed," based upon a reading of the
> statute that failed to harmonize its various
> components.  Because §707(b)(2)(A)(iii) "specifically
> addresses how secured debt payments are to be

calculated," the trustee's reading of the "notwithstanding" sentence goes too far.  The Official Forms, however, synthesize the various requirements of the statute." *Id.*, 745.  This court agrees with the *Scott* court's analysis and also with the views expressed in *Collier*, which are that reading the provision to preclude a debtor from claiming housing or transportation ownership expense on the grounds that they constitute payments for secured debt, and therefore are excluded by the "notwithstanding" sentence, goes too far.  Arguments based on the "notwithstanding" sentence do not withstand "textual or policy scrutiny" *Collier* states, because the language of that sentence "means simply what it says.  Although the IRS Other Necessary Expense standards permit debtors to make payments on other secured and unsecured debts, such payments are not allowed as part of the means test use of the IRS standards.  *The amounts deducted under the transportation ownership allowances are not payments for debts.  They are the 'amounts specified' by the allowance*." [6 Collier on Bankruptcy p. 707.04[3][c] at 707-32 to 707-33 (16th ed., Alan J. Resnick & Henry Sommer, eds.)(emphasis added.)

*In re Jackson*, 537 B.R., 247, *aff'd, Lynch v. Jackson (In re Jackson)* 853 F.3d 116 (4th Cir. 2017).

The chapter 13 trustee in *In re Prigge*, 441 B.R. 667 (D. Mont. 2010), using the "Notwithstanding Clause" of §707(b)(2)(A)(ii)(I), made a "cap not allowance" argument, urging the court to decide that "'nothing in the disposable income calculation allows the deduction for payments on debt,'" and asking that the debtor's payments on his home mortgage loan and auto loan be stricken and that he be limited to only the Standards amounts for housing and vehicle operating expenses.  The court held that "all the authorization needed is found in clause (i) of §707(b)(2)(A):

> In considering under paragraph (1) whether the granting of relief would be an abuse of the provisions of this chapter, the court shall presume abuse exists if the debtor's current monthly income *reduced by the amounts determined* under clauses (ii), *(iii)*, and (iv), and multiplied by 60 is not less than the lesser of . . . .
> §707(b)(2)(A)(i), emphasis original.

*Id.*, 673.

It is clause (ii) that contains the "Notwithstanding" language. "The Trustee's argument that clause (ii) controls over clause (iii) conflicts with common canons of statutory construction and with clause (i)." *Id*. The *Prigge* court, finding that "[t]he Trustee's objection . . . that the IRS Standards under clause (ii) control over clause (iii) is contrary to controlling Ninth Circuit authority, and based on *Egebjerg*," [*Egebjerg v. Anderson (In re Egebjerg),* 574 F.3d 1045 (9th Cir. 2009)] overruled the objection. The relevant portions of the Official Form have remained the same since 2005 and this court will not reject the clear language in those instructions in absence of an actual conflict with the Code or precedential authority.

**V.  The Trustee's Public Policy Argument.**

The Trustee does not argue the Debtor's petition or plan were filed in bad faith. Instead, the Trustee contends that permitting debtors to deduct payments made on non-purchase-money car loans invites abuse. The determination of good faith in the Ninth Circuit is based on a review of the totality of the circumstances. In the absence of bad faith, debtors are permitted to avail themselves of the protections afforded by the Code, here, the deduction of the Automobile Loan payments under

the Standards. *See*, *Law v. Siegel,* 571 U.S. ----, 134 S. Ct.
1188, 1194 (2014). (Not bad faith to simply do what Code
permits).  The Trustee's fear, that some debtors may abuse the
Bankruptcy Code, is not without merit, however the law provides
remedies for abuse or manipulation of the Code.

Evidence that a debtor, shortly before filing the case,
encumbered an asset held free and clear and used those funds
frivolously might result in dismissal of the case or denial of
confirmation.  There is no evidence of any similar facts in this
case.  Rather, it appears that the Debtor here was "honest but
unfortunately gullible."  In April 2015, the Debtor joined an
internet dating website and began communicating with a "Tyler
Nunez."  During 2015 the Debtor took out a home equity loan for
approximately $90,000, obtained a car equity loan for
approximately $14,000, and withdrew funds from her IRA,
incurring priority income tax liabilities of approximately
$43,000.

At the time the Debtor filed this case on March 30, 2016,
she was indebted on the following personal loans in the
following approximate amounts:

| | |
|---|---|
| Allied Cash Advance: | $ 5,000; |
| Argon: | $ 5,000; |
| Avant Credit of California: | $23,000; |
| Borrowers First, Inc.: | $15,000; |
| CircleBack Lending: | $18,500; |
| Discover Personal Loans: | $24,000; |
| Lending Club: | $21,000; |

| | |
|---|---|
| LoanMe, Inc.: | $99,000;[41] |
| Prosper: | $20,000; |
| Safe 1 Credit Union: | $ 9,766; |
| Synchrony Bank: | $ 2,300; |
| Upstart Network, Inc.: | $34,700. |

It appears that these personal loans were incurred between April 2015, and December 2015.  In the Debtor's amended Statement of Financial Affairs filed June 10, 2016, Part 6, she lists 2015 losses due to fraud in the amount of $462,000.  Approximately $250,000 of these funds originated as personal loans.  There is no evidence the Debtor used these borrowed funds for her or her family's personal benefit.  She shows no profligate expenditures in her schedules.  She did not pay down her exempt homestead, but instead encumbered it further, as well as re-financing the Automobile.

According to the amended complaint filed in the Adversary Proceeding, the Debtor was under the impression that "Tyler Nunez," her "fiancé," was a major in the U.S. Army stationed overseas, that he had discovered a large sum of money in a cave, and would send the Debtor $2.9 million if she would transfer funds to an account designated by him.  Between June 2 and August 5, 2015, the Debtor transferred $462,600 to a deposit account in the name of "Lixuan Weng."  Approximately $212,000 of this was from the Debtor's own funds- the Debtor singly incurred personal losses nearly equal to those of all of her unsecured lenders put together.

///

---

[41] This creditor filed the adversary proceeding against the Debtor.

**Conclusion.**

The court's conclusion, that the payment on the Automobile Loan is a "vehicle-ownership expense" and that the Standard for that category is an allowance and not a cap, is consistent with Ninth Circuit jurisprudence and the philosophy underlying BAPCPA when it created two categories of debtors, those "below median income," and those "above median income"-those eligible for chapter 7 discharges and those who are required to file under chapter 13 in order to obtain a discharge. Congress expressed a desire for more uniformity and less discretion by courts in determining what chapter 13 debtors should repay in a plan. The language in the statute and the language in the Official Form and its instructions are clear and can be reconciled to produce a logical result. The court can use evidence of "bad acts" to tame the serpents, thus keeping the "cobra effect" safely away from participants in the bankruptcy process. In the absence of evidence of extrinsic "bad acts" the Debtor may avail herself of the provisions of the Code.

The objection is overruled. The Debtor's plan is confirmed. A separate order will issue prepared by the Trustee and signed by Debtor.

**Dated:** Aug 30, 2017                    **By the Court**

René Lastreto II, Judge
**United States Bankruptcy Court**

47

**Instructions to Clerk of Court**
**Service List - Not Part of Order/Judgment**

The Clerk of Court is instructed to send the Order/Judgment or
other court generated document transmitted herewith to the
parties below.  The Clerk of Court will send the Order via the
BNC or, if checked  __X__ , via the U.S. mail.

Debtor(s), Attorney for the Debtor(s), Bankruptcy Trustee (if
appointed in the case), and  __X__  Other Persons Specified Below:

Ellyn D. Lopez
1844 Summer Drive
Delano CA 93215

Michael H. Meyer
PO Box 28950
Fresno CA 93729-8950

Office of the U.S. Trustee
United States Courthouse
2500 Tulare Street, Room 1401
Fresno CA 93721

Patrick Kavanagh
1331 L St
Bakersfield CA 93301